QUINCE, Associate Judge.
Michael Cascio (Cascio) challenges the grant of summary judgment in favor of St. Joseph Hospital of Port Charlotte, Inc. and Rita Greer, R.N. in this medical malpractice action. We reverse because the trial court erred in finding that the nature of the injury put Cascio on notice that medical negligence possibly caused his injury thus commencing the running of the statute of limitations on the date of injury.
*1100 On April 25, 1994, Cascio was admitted to. St. Joseph’s Hospital (the hospital) for treatment of spinal injuries. Prior to cervical spine surgery, Cascio’s physician ordered a cervical myelogram and CT scan. The cervical myelogram was performed by Dr. Daniel Turfariello, and Nurse Greer was in attendance during the procedure. Cascio recalls being taken for the myelo-gram and being placed on a table on his stomach. He does not recall the procedures, but remembers waking up in great pain following the procedures. Cascio was advised by his admitting physician, Dr. Jose Cabrero, that he had dislocated his shoulder during a grand mal seizure. Cas-cio was told that he was suffering from spinal stenosis and diseases of the spine. He was also told that the seizure could have resulted from natural causes, and that these causes and the spinal diseases were normal complications from the mye-lography procedure.
Thereafter, Cascio obtained legal counsel, and in January 1996 brought an action against Dr. Tufariello for medical negligence for injuries he received during the cervical myelogram. On or about February 5, 1996, Dr. Tufariello filed an answer to the complaint and included as an affirmative defense that Cascio’s damages were caused in whole or in part by third parties. Dr. Tufariello, during his deposition on February 10, 1997, discussed the risks associated with a myelogram, including the possibility of a seizure. He added that the risk of seizure is decreased when the patient’s head is elevated. He opined that the nurses may not have followed his postoperative orders concerning the maintenance of Cascio’s head because when he saw Cascio during the seizure, Cascio was lying fairly flat. Cascio thus maintains that it was during this deposition that he became aware of the possibility that the seizure was caused by a failure to follow medical protocol. Cascio filed the notice of intent to initiate litigation against the hospital and Greer on February 26, 1997, and amended his complaint to include them as defendants on May 21.1997.
In a motion for summary judgment, the hospital and Greer claimed that Cascio’s claim for negligence was barred by the statute of limitations. They claimed that Cascio was aware of them as potential defendants immediately following his injuries. The trial judge ruled that Cascio’s injury was of such a nature that a reasonable person would question why it had happened during this type of procedure. The court additionally found that the hospital and Greer would be “within the zone of anticipated targets for a lawsuit.” Therefore, the trial court opined that Cas-cio was on notice of his injuries and of the identity of the potential defendants as of April 25, 1994. Thus, he found the statute of limitations began to run on that date, and the 1997 amended complaint was time barred.
While it is true that Cascio’s interrogatories identified the date that he first became aware of his injuries as April of 1994, the evidence shows that he did not discover that the hospital and Greer potentially shared fault in the injuries until February 1996, when Dr. Tufariello answered the complaint and raised the negligence of other hospital employees as an affirmative defense.[1] Our review of the record convinces us that the nature of the injury at issue is not of the kind that is immediately apparent as being caused by medical malpractice. According to Cascio, he was told that the dislocated shoulder occurred during a grand mal seizure and that such a seizure was one of the possible complications from this medical procedure. Additionally, there was nothing in the hospital records that would have alerted Cascio that his injury was caused by something other than what was explained to him. *1101 Tanner v. Hartog, 618 So.2d 177 (Fla.1993), contrary to the trial court’s assertion, does not require a finding that the plaintiff in this action was on notice of both the injury and the possibility of medical malpractice on the date of his injury.
In Tanner the court indicated that knowledge of an injury alone is not sufficient to trigger the commencement of the statute of limitations for medical malpractice. Justice Grimes, writing for the majority, stated:
We hold that knowledge of the injury as referred to in the rule as triggering the statute of limitations means not only knowledge of the injury but also knowledge that there is a reasonable possibility that the injury was caused by medical malpractice. The nature of the injury, standing alone, may be such that it communicates the possibility of medical negligence, in which event the statute of limitations will immediately begin to run upon discovery of the injury itself. On the other hand, if the injury is such that it is likely to have occurred from natural causes, the statute will not begin to run until such time as there is reason to believe that medical malpractice may possibly have occurred.
Tanner, 618 So.2d at 181-182. The court indicated in Tanner that the fact that the parents had knowledge of a stillbirth, without more, did not suggest the possibility of medical negligence. Thus, application of Tanner to a situation where the injury does not immediately suggest the possibility of negligence requires a determination of when the plaintiff became aware of the possibility that his injuries were possibly the result of the defendants’ negligence.
The legislative policy underlying the medical malpractice area supports our decision in this case. In an effort to foster full investigation of medical malpractice claims, promote pre-suit settlement of claims and prevent the filing of baseless litigation, the legislature enacted section 766.203, Florida Statutes (1997), which requires a potential plaintiff to conduct a thorough pre-suit investigation of the medical viability of a malpractice claim. See Kukral v. Mekras, 679 So.2d 278, 280 (Fla.1996). Claimants who fail to conduct a full investigation are subject to having their claims dismissed and are potentially liable for the defendant’s attorney fees and costs. See § 766.206, Fla. Stat. (1997). As Judge Parker pointed out in his concurring opinion in Rogers v. Ruiz, 594 So.2d 756, 772 (Fla. 2d DCA 1991):
The message in that case is clear. Once the body is in the ground or once. an adverse result occurs from a medical procedure, a grieving family member or dissatisfied patient, in order to protect a possible and unknown right to damages, should retain an attorney immediately and start subpoenaing medical records. This, to me, is a further wedge driven between formerly trusting relationships involving hospitals, doctors, patients, and attorneys. The message is clear. If one thinks anything adverse possibly could have happened to him or her or to a loved one while undergoing medical care, one immediately must demand all medical records and retain an expert to review those records and to advise the patient or family.
One’s access to the courts should not turn on the “fiction that a normal, but unfortunate, incident of proper medical care and treatment in the eyes of a lay person is in fact legal notice of possible malpractice.” See Tanner v. Hartog, 593 So.2d 249, 253 (Fla. 2d DCA 1992) (Patterson, J., dissenting), reversed, 618 So.2d 177 (Fla.1993).
In this case, Cascio did begin an immediate investigation. However, the hospital’s and Greer’s potential culpability did not come to light until Dr. Tufariello’s answer in February 1996 and, more concretely, his deposition in February 1997. Cascio brought his claim a little more than a year following receipt of the initial indication of the Hospital’s wrongdoing and a mere three months after this information was confirmed in Dr. Tufariello’s deposition. We believe that this timing complies *1102 with the applicable statute of limitations. Suit was brought within two years of the time Cascio first learned of the possible negligence of the hospital and Greer and within four years of the incident.
Thus, the trial court erred in granting summary judgment based on the Statute of Limitations. The decision granting summary judgment is hereby reversed.[2]
PARKER, C.J, and FULMER, J., Concur.

. The initial complaint filed against Dr. Tufar-iello alleged medical malpractice on the part of the doctor because he used a dosage of Osovue 300 in doing the myelogram that was greater than the maximum dosage recommended (thus, presumably causing the grand mal seizure).

. We also note that Cascio's appeal raises the question of whether summary judgment was improvidently granted because of the existence of genuine issues of material fact. We find that Cascio has argued at least two potential causes for his seizure. We believe the true cause of the seizure presents a genuine issue of material fact which makes the grant of summary judgment at this stage improper.